<u>NOT FOR PUBLICATION</u>                                              (Docket No. 61, 67, 72, 77, 84)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____

TIMOTHY MULLIN AND MARIE          :
MULLIN,                           :
                 Plaintiffs,      :          Civil No. 06-480 (RBK)
        v.                        :          **OPINION**
                                  :
KELLER LADDER COMPANY; PFI        :
CONSTRUCTION CORP. a/k/a THE      :
PARSONS CORPORATION,              :
                                  :
                 Defendants.      :
_____ :

_____

KELLER LADDER COMPANY,            :
                                  :
                 Plaintiff,       :
        v.                        :
                                  :
JOHNSON MATTHEY, INC. and         :
PFI CONSTRUCTION CORP. a/k/a THE  :
PARSONS CORPORATION,              :
                                  :
                 Defendants.      :
_____ :

_____

JOHNSON MATTHEY, INC. and         :
PFI CONSTRUCTION CORP. a/k/a THE  :
PARSONS CORPORATION,              :
                                  :
                 Plaintiffs,      :
        v.                        :
                                  :
BROWN AND GUARINO, INC.,          :
                                  :
                 Defendant.       :
_____ :

1

**KUGLER**, United States District Judge:

This case arises out of Plaintiff Timothy Mullin's (Mullin's) fall from a ladder in 2002 during his employment with Brown and Guarino, Inc.  At the time, Brown and Guarino was a subcontractor working for contractor PFI Construction Corp. ("PFI") on land owned by the company Johnson Matthey, Inc.  Multiple motions are presently before the Court in this case. The Court considers Defendant Keller Ladder Company's ("KLI's") motion for summary judgment on Plaintiff Mullin's complaint; third-party Defendant Johnson Matthey's motion for summmary judgment on the claims of third-party Plaintiff KLI; third-party Plaintiff PFI's motion for summary judgment against fourth-party Defendant Brown and Guarino; and fourth-party Defendant Brown and Guarino's cross-motion on the claims of third-party Plaintiff PFI.

## I.      BACKGROUND

Mullin is employed as a sheet metal worker by Brown and Guarino, a company which does architectural sheet metal work, including metal roofing, siding, gutters, and other roof items.  (Mullin Dep. Mar. 20, 2007 at 6:22-8:24.)  He is a union member out of Philadelphia Local 19 and has worked in the sheet metal business for over 26 years.  (Mullin Dep. Mar. 2, 5005 at 9:9-11.)  On June 18, 2002, he reported to work at around 7 am to get instructions and equipment for that day's work.  He was told by his supervisor, Barry Rosenberg, that he would be working at the Johnson Matthey facility.  (Mullin Dep. Mar. 20, 2007 at 22:2-24:11.)  Rosenburg told Mullin that he would be working on a guard shack needing some roofing and gutter work. Mullin loaded the equipment he would need for the half-day job onto his personal vehicle.  (Id.) Rosenburg told Mullin to take a ladder that was on Rosenburg's company vehicle.  Mullin, after

inquiring to be certain about the ladder Rosenburg had indicated, took the ladder off Rosenburg's truck and placed it on his own.  (Mullin Dep. Mar. 20, 2007, at 27:2-25.)  He had not used that ladder before June 18, 2002.  (Id. at 29:1-6.)  The ladder was the top section of a two-part extension ladder.  It was sixteen feet tall and made of orange fiberglass.  (Id. at 32:7-10, 48:14-19.)  It is unclear whether there were any labels or distinguishing marks on it; Plaintiff does not recall seeing any.  (Id. at 32:12-14)  Mullin drove to the jobsite at Johnson Matthey with his apprentice, Al Dinter.  (Mullin Dep. Mar. 2, 2005 at 15:16-19.)  Mullin asked his apprentice to do some other tasks around the corner of the guard shack, while Mullin set the ladder up against the guard shack in order to climb onto the roof to see what needed to be done.  (Id. at 17:2-8.)  He looked for a place to tie the ladder off and found a roof vent.  (Id. at 16:19-24)  Mullin began to descend the ladder to get some rope.  (Id. at 21:20-25.)  He stepped onto the ladder and swung his body around.  (Id.)  At that point, the bottom of the ladder slipped out and he fell down to the ground along with the ladder.  (Id. at 23:1-8.)  As a result of this fall, Mullin sustained injuries, including some permanent injuries and damage to the cartilage in his knee which eventually required surgery.  (Id. at 30:21-34:25.)

After the accident, the ladder disappeared.  Mullin was informed that a safety coordinator from PFI confiscated the ladder.  (Mullin Dep. Mar. 20, 2007 at 91:12-92:14.)  It was never returned to Brown and Guarino.  (Id. at 96:22-24.)

Mullin and his wife filed a lawsuit in the Superior Court of New Jersey, Camden County on July 16, 2004 against Werner Company and Louisville Ladder Group (both ladder manufacturers), as well as Johnson Matthey and general contractor PFI.  Mullin also included numerous fictitious name placeholders in his complaint.  The Complaint included claims founded

3

in products liability, breach of warranty, and negligence; Mullin's wife claims loss of consortium.[1]

On March 8, 2005, Defendant Werner moved for summary judgment, arguing that it did not manufacture the ladder in question.  Judge Mary Eva Colalillo granted Werner's motion on April 15, 2005.  On November 29, 2005, Louisville Ladder similarly moved for summary judgment.  In the meantime, Mullin had retained an expert.  On November 8, 2005, the expert, John Morse of Ryan Engineering, produced a report indicating that the ladder was manufactured by Keller Ladder Company (now known as "KLI").  On November 14, 2005, Mullin sought to file an amended complaint.  In his motion, Mullin reported the expert's conclusions as to KLI and also noted that Keller Ladder Company was no longer in business and that the Werner Company had acquired its assets.  Mullin asked to amend his complaint to add both Keller Ladder Company and Werner Company as defendants.  This motion was granted, and Mullin filed an Amended Complaint on January 14, 2006, and served it on Keller Ladder Company. KLI timely removed the case to this Court.  KLI also filed a third-party complaint for contribution against Johnson Matthey and PFI.  Johnson Matthey and PFI, in turn, filed fourth-party complaints against Brown and Guarino for indemnification.  Mullin later added a direct claim against PFI for spoilation of evidence based on the loss of the ladder.

In the motions now before this Court, Defendant KLI moves for summary judgment on Mullin's claims for failure to comply with the statute of limitations.  Third-party defendant Johnson Matthey moves for summary judgment on the claims of KLI  (in its role as third party

---

[1] Marie Mullin's claims are derivative of Timothy Mullin's claims.  References to "Plaintiff" or "Mullin" are specific to Timothy Mullin.

plaintiff) for contribution, arguing that Johnson Matthey owed no duty to Plaintiff Mullin.

Johnson Matthey further argues that even if liability exists, Fourth Party Defendant Brown and

Guarino is contractually required to indemnify Johnson Matthey.  KLI, PFI, and Brown and

Guarino oppose this motion.  PFI, in its role as Fourth Party Plaintiff, similarly moves for

summary judgment against Brown and Guarino.  Brown and Guarino cross-moves for summary

judgment on the indemnification issue.  There are no motions before the Court based on the

spoilation of evidence claim.


## II.    STANDARDS OF REVIEW

Summary judgment is appropriate where the Court is satisfied that "there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A genuine issue

of material fact exists only if "the evidence is such that a reasonable jury could find for the

nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In evaluating the

evidence presented by the parties, the Court "must view the facts in the light most favorable to

the nonmoving party and draw all inferences in that party's favor."  Andreoli v. Gates, 482 F.3d

641, 647 (3d Cir. 2007) (citation omitted).

The burden of establishing the nonexistence of a "genuine issue" is on the party moving

for summary judgment.  Celotex, 477 U.S. at 330.  The moving party may satisfy this burden by

either (1) submitting affirmative evidence that negates an essential element of the nonmoving

party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is

insufficient to establish an essential element of the nonmoving party's case.  Id. at 331.

Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## III.   DISCUSSION

### A.   STATUTE OF LIMITATIONS

KLI argues that it is entitled to summary judgment because Mullin's claims are barred by the statute of limitations. Mullin argues that he successfully preserved his ability to add KLI as a defendant by employing New Jersey's fictitious party rule.[2]

There is no doubt that Mullin's injury occurred on June 18, 2002, and there is similarly no doubt that the statute of limitations within which to bring a claim based on that injury expired on June 18, 2004. See N.J.S.A. 2A:14-2 ("Every action at law for an injury to the person caused by the wrongful act, neglect or default of any person within this State shall be commenced within 2 years next after the cause of any such action shall have accrued. . . ."). However, the

---

[2] Plaintiff Mullin style's his submission in response to defendant KLI's motion as a "Cross-Motion to Dismiss Defendant, KLI's Statute of Limitations Defense," the Court construes this as a brief in opposition to the motion to dismiss, as Plaintiff Mullin does not seek any action from the Court other than a ruling on the statute of limitations issue. The Court therefore consider's Plaintiff Mullin's letter reply brief at Docket Entry No. 82 to be an impermissible sur-reply and does not consider it. See Local Civ. R. 7.1(d)(6) ("No sur-replies are permitted without permission of the Judge").

amendment will be permitted under Federal Rule of Civil Procedure 15(c) if the amendment can

"relate back" to the date of the original pleading under state law.[3]  New Jersey law provides that

amendments adding a defendant will relate back to the original pleading if the plaintiff properly

pleads a fictitious name prior to the expiration of the limitations period.  N.J.R. 4:26-4.[4]  This

fictitious party rule permits a plaintiff to hold a place for a defendant whose identity he cannot

yet ascertain.  This rule is not always available, however.  To invoke the rule, the fictitious name

in the complaint must have been accompanied by an appropriate description sufficient to identify

the defendant.  See Rutkowski v. Liberty Mut. Ins. Co., 506 A.2d 1302, 1306 (N.J. Super. Ct.

App. Div. 1986).  Additionally, the plaintiff must have used due diligence to try to determine the

defendant's identity before and after filing the complaint.  See Matynska v. Fried, 811 A.2d 456,

457 (2002).  Moreover, the application of the rule must not prejudice the defendant.  See Mears

v. Sandoz, 693 A.2d 558, 563-64 (N.J. Super. Ct. App. Div. 1997).

### 1.	Appropriate Description

In the original complaint, Mullin pled:

"Defendants, Werner Company, Louisville Ladder Group, LLC and/or John Does 1-10

(fictitious names) designed, manufactured, sold and /or distributed the extension ladder used by

---

[3] Fed. R. Civ. P. 15(c)(1) provides, in part: " An amendment to a pleading relates back to the date of the original pleading when:  (A) the law that provides the applicable statute of limitations allows relation back."

[4] New Jersey Rule 4:26-4 provides, in part:  "In any action. . .  if the defendant's true name is unknown to the plaintiff, process may issue against the defendant under a fictitious name, stating it to be fictitious and adding an appropriate description sufficient for identification. Plaintiff shall on motion, prior to judgment, amend the complaint to state defendant's true name, such motion to be accompanied by an affidavit stating the manner in which that information was obtained."

plaintiff and/or its component parts prior to June 18, 2002.  The specific identity of the extension

ladder entity is presently unknown so fictitious names are employed until discovery occurs at

which time the proper ladder company may be identified."

Mullin sufficiently described the unknown "extension ladder entity" to satisfy this

requirement.  The Complaint  indicates that the missing party is a ladder manufacturer and does

not use an overly general fictitious placeholder.  See Rutkowski, 506 A.2d at 1306 (". . . a

plaintiff who is injured in an industrial accident should at least name as fictitious parties, if their

true identities are unknown, those entities that designed, manufactured, and maintained the

subject machine and its component parts").

## 2.   Due Diligence

There is no precise definition for what due diligence requires; the meaning must be

determined based on the facts of each particular case and with respect to prior case law.

DeRienzo v. Harvard Indus., Inc., 357 F.3d 348, 354 (2004).  The Court finds Claypotch v.

Heller, 823 A.2d 844 (2003) to be most analogous to the present situation.  In Claypotch, the

plaintiff was injured when a piece of metal on the hydraulic punch press he was operating shot

out of the machine and into his eye.  Based on a label on the machine with the name "Heller,"the

plaintiff and his employer believed that the machine was manufactured by Heller, Inc.  The

plaintiff therefore filed a products liability action, specifically naming as a defendant only Heller,

but also including "ABC Corporations 1-10" and "John Does 1-10" "representing unidentified

manufacturers, distributors, designers, repairers and sellers of the punch press."  Id. at 847.  After

the statute of limitations expired, Heller filed against a third-party defendant.  Discovery

eventually revealed that this third-party defendant, FICEP, S.p.A, was the actual manufacturer of

8

the product.  The plaintiff sought to file an amended claim directly against FICEP over two years after the statute of limitations had expired.

Similarly, Plaintiff Mullin and his employer in this case believed that the ladder was manufactured by either Werner or Louisville, and so sued those specific defendants, including John Does 1-10, identified as fictitious "extension ladder entities," as well.  When it became clear that neither Werner nor Louisville had, in fact, made the ladder in question, Plaintiff Mullin attempted to find the true manufacturer.

KLI argues that Mullin's failure to begin this investigation prior to the expiration of the statute of limitations shows a lack of due diligence.  However, the Appellate Division in Claypotch, in holding that the plaintiff had acted with due diligence, noted that the plaintiff had a reasonable basis for believing that Heller was the manufacturer because of the labeling on the product and the representations of the plaintiff's employer.  Id. at 849.  Plaintiff Mullin similarly had a reasonable basis for his initial choice of parties.

Plaintiff testified at his deposition that the only manufacturer names he ever saw on ladders around Brown and Guarino were Louisville and Werner. (Mullin Dep. Mar. 20, 2007 at 43:20-25.)  He had not heard of Keller brand ladders before he learned about the company from his attorney.  (Id. at 44:7-14.)  At some point after the accident, Plaintiff spoke with Mark Levin, a Brown and Guarino employee with responsibilities for safety and equipment management, about the ladder.  Plaintiff is not sure when this conversation took place.  (Id. at 34:10-38-7.)  Levin told Plaintiff that he sometimes purchased ladders from Home Depot and sometimes from a distributor.  He did not provide Plaintiff with any other information.  (Id.)  Mullin, like the plaintiff in Claypotch, therefore had a reasonable basis for naming the initial defendants in his

9

case but including fictitious parties in case later evidence showed his belief to be mistaken.

Additionally, Mullin did not unduly delay after learning that Werner and Louisville had likely not manufactured the ladder. In April 2005, Defendant Werner was dismissed from the case. In September 2005, Mullin retained a ladder expert. On November 8, 2005, the expert identified KLI as the probable manufacturer. Less than a week later, on November 14, 2005, Mullin moved to amend his complaint to add KLI. After this occurred, Defendant Louisville moved for dismissal on November 29, 2005. Mullin's motion was granted on December 16, 2005, and Defendant KLI was served on January 14, 2006. The Court finds that Mullin acted promptly to identify the true manufacturer and in amending the complaint to add that party.

KLI also argues that no new evidence was uncovered during the intervening time before KLI was identified, a fact it claims illustrates Mullin's lack of due diligence. KLI further argues that the photograph of the ladder relied on by Mullin's expert was taken on the day of the accident and available to be reviewed at any time after the accident and before the expiration of the statute of limitations. However, the Court is not persuaded by these arguments.

At some point, Mullin learned that Mark Levin took at least one photograph of the ladder at the accident site. Plaintiff testified that he may have known about the existence of the photograph as early as January 2003. (Mullin Dep. Mar. 20, 2007 at 57:21-58:14.) At first, Mullin thought there was only one photograph. He later learned that there were several. (Id. at 52:18, 64:18-20.) Those photographs were in the possession of Brown and Guarino, and it is unclear how they came into the possession of Mullin and his attorney. When Mullin did come into possession of the photograph of the ladder, he attempted to use it as a tool. He took the photograph to his workplace and compared the photograph with other ladders at the shop (id. at

81:16-82:24) and eventually retained an expert to identify the manufacturer of the ladder.

This photograph is not like a police report (Cardona v. Data Systems Computer Ctr., 618 A.2d 864, 865 (N.J. Super. Ct. App. Div. 1992), a hospital chart (Matynska, 811 A.2d at 457), or contractor meeting minutes (Mears, 693 A.2d at 632), all of which identify the previously-unknown party by name with no further inquiry required.  The photograph merely depicts a ladder leaning up against a building.  (KLI Ex. B.)  Further expert analysis is required to connect the ladder to its manufacturer.  The fact that Mullin had access to the photograph since before the expiration of the statute of limitations but did not seek an expert opinion on it until after one of the original defendants was dismissed does not itself show a lack of due diligence.

Certainly Mullin could have done more to ascertain the manufacturer of the ladder at an earlier time.  He could have made a more exhaustive search of his employer's records, retained an expert earlier, and tried harder to locate the ladder.  However, the Court holds that Mullin's actions were enough to satisfy the due diligence requirements of N.J.R. 4:26-4.

**3.      Prejudice to Defendant**

KLI argues that it will suffer substantial prejudice if Mullin's claims against it are allowed to proceed.  The primary reason for this potential prejudice is the loss of the ladder.  Though it is not explicitly enumerated as a factor under N.J.R. 4:26-4, the Court should consider whether a defendant has suffered prejudice or relied in some way on the expiration of the limitations period.  Mears, 693 A.2d at 562.  However, some prejudice to the defendant will not automatically determine the outcome when "[j]ustice impels strongly towards affording the plaintiffs their day in court on the merits of their claim."  Farrell v. Votator Div. of Chemtron Corp., 299 A.2d 394, 400 (N.J. 1973).

11

Loss, alteration, or destruction of evidence can certainly constitute prejudice. See Mears, 693 A.2d at 633 (loss of allegedly defective scaffold constituted prejudice to defendant scaffold manufacturer). Evidence has indeed been lost; the ladder at issue cannot be found. However, the ladder has been missing, as KLI admitted in its papers, since "on or about the date of the accident" in 2002. There is no indication that Mullin had access to the ladder at any point after the date of the accident; neither he nor any of the other parties have been able to examine the ladder. KLI would not have been able to examine the ladder to determine if it was indeed a KLI product had it been sued within the statute of limitations, which certainly would have been permissible, and it suffered no further prejudice by not being brought into the case until 2005.

The Court also notes that KLI effectively removed this case to federal court and brought a number of other parties into the case. KLI has been able to take discovery, including deposing the plaintiff. This is not a situation where a defendant has been brought in at the last minute after the close of all discovery and is unable to properly represent its interests.

### 4.       Conclusion

The Court is persuaded that Mullin has met the requirements of N.J.R. 4:26-4 in seeking out the who he believes is the true manufacturer of the ladder and therefore concludes that Mullin can preserve his claims against KLI by application of the fictitious party rule. The Court notes that Plaintiff Mullin still bears the burden at trial to prove that the ladder was in fact a KLI product as part of his burden on causation-in-fact. See McLaughlin v. Acme Pallet Co., 658 A.2d 1314, 1316 (N.J. Super. Ct. App. Div. 1995) (causation-in-fact is an indispensable ingredient of plaintiff's prima facie case and requires proof that the defect existed when the product was distributed by and under the control of defendant) (citing Shackil v. Lederle

Laboratories, 561 A.2d 511, 514-15 (N.J. 1989).

**B.     JOHNSON MATTHEY'S DUTY**

Johnson Matthey moves for summary judgment on third-party Plaintiff KLI's claims for contribution, arguing that it did not owe a duty of care to Mullin because Mullin was an independent contractor injured while in the performance of the contracted work.  KLI opposes this motion, stressing the safety responsibilities that Johnson Matthey retained over employees and Johnson Matthey's failure to enforce its own safety rules.  KLI also argues that there are questions of fact about Johnson Matthey's control over the worksite.

As a preliminary matter, the Court will not consider KLI's argument that summary judgment cannot be granted because outstanding discovery requests remain.  Under Federal Rule of Civil Procedure 56(f), the Court may deny a motion for summary judgment because of outstanding discovery issues involving "facts essential to justify the party's opposition."  The opposing party must comply with the mechanics of Rule 56(f), however.  The Third Circuit has "interpreted Rule 56(f) as requiring a party seeking further discovery in opposition to a summary judgment motion to file an affidavit specifying what information is sought, how it would preclude summary judgment if uncovered, and why it had not been previously obtained."  Zheng v. Quest Diagnostics, Inc., 248 Fed. App'x. 416, 421 (3d Cir. 2007); see also Radich v. Goode, 886 F.2d 1391, 1393-95 (3d Cir. 1989).  Such an affidavit has not been provided to the Court.  The Court will not consider the discovery issue in resolving this motion.

Whether a duty of care is owed to a plaintiff is generally considered "a matter of law properly decided by the court."  Wang v. Allstate Insurance Co., 592 A.2d 527, 534 (N.J. 1991).  A landowner such as Johnson Matthey has a nondelegable general duty to ensure the safety of the

premises on which work is to be performed.  Pfenninger v. Hunterdon Cent. Reg'l High Sch.,

770 A.2d 1173, 1179 (N.J. 1999).  This general rule is counteracted by the oppsing rule that a

landowner is usually under no duty to protect an employee of an independent contractor from

hazards created by the performance of the contracted work.  Id.; Gibilterra v. Rosemawr Homes,

115 A.2d 553, 555 (N.J. 1955).  A landowner may assume a duty of care to independent

contractors, however, by maintaining control over the worksite or controlling the manner in

which the work is performed.  Sanna v. Nat'l Sponge Co., 506 A.2d 1258, 1262 (N.J. Super. Ct.

App. Div. 1986); Majestic Realty Assoc. v. Toti Contracting Co., 153 A.2d 321, 324 (N.J. 1959).

The Court must therefore analyze the level of Johnson and Matthey's participation and control

over the work site and manner of work to determine if Johnson Matthey assumed a duty of care

to Mullin as an employee of independent contractor Brown and Guarino.

     Johnson and Matthey hired PFI as the construction manager on the project.  PFI

subcontracted the roofing work to Brown and Guarino.  Brown and Guarino, as roofing

subcontractor, would have dealt only with PFI.  (Henry Dep. 107:14-21.)  The parties'

relationship was governed by a Construction Subcontract Agreement ("the contract"), which

included some discussion of safety responsibilities.  Articles 8.0 and 8.1 of the contract provide

that "Subcontractor shall take necessary precautions for the safety of employees on the work" and

that "Subcontractor shall adhere to, and enforce Contractor's and Owner's safety regulations."

(Donovan Cert., Ex. H at 7.)  The contract also provides, in Appendix B, that "[p]roject safety

will be monitored by Contractor on a daily basis.  Safety violations shall not be tolerated and

Contractor shall have the authority to rectify these violations immediately if proper action is not

taken by Subcontractor."  (Donovan Cert., Ex. H at 18.)

Of greater importance than these contractual responsibilities, however, is the "actual participation" of Johnson Matthey in the on-site work.  See Pfenninger, 770 A.2d at 1182 (noting that "the parameters of owners [and] general contractors and the like for construction site/workplace safety, focuses not so much on how each is characterized but rather upon their actual participation. . .").  The safety manager for the site was the PFI safety engineer.  (Henry Dep. 30-2-7.)  This person visited the worksite weekly.  (Henry Dep. 24:8-16.)  PFI maintained a policy that subcontractor workers would check in with a PFI employee and receive a safety training, if they had already not been instructed on the safety rules at that particular worksite, before beginning work.[5]  (Id. at 38:19-39:13; 83:24-84:25.)  PFI would also generally inspect materials or equipment brought by subcontractor employees.  (Id. at 41:3-9.)  Johnson Matthey safety engineers were also present at the jobsite.  (Id. at 79:12-80-2.)  These safety engineers would walk through the site and if they saw safety violations, they would report the violations to PFI.  (Id. at 80:5-7.)  The PFI representative testified that there was "always" a Johnson Matthey safety engineer at the site, (Id.. 80:8-11; 79:14-16), and a Johnson Matthey engineer testified that he would walk around the construction projects at least once a day, and sometimes more  (Slivak Dep. 18:24-18-5.)  These Johnson Matthey safety engineers would periodically inspect larger pieces of equipment coming onto the site, though it does not appear that they would have inspected equipment such as a ladder.  (Henry Dep. 80:12-25.)  PFI was in charge of ensuring that subcontractors followed the standards in the safety manual; Johnson and Matthey did not share this responsibility.  (Id. 81:16-82:5.)  Johnson Matthey did not have a permanent employee

---

[5] Plaintiff Mullin apparently did not check in the day he was injured.   (Henry Dep. 38:5-39:6.)

assigned to work at or supervise the construction site on a full-time basis.  (Slivak Dep. 67:10-14.)  Johnson Matthey also did not provide any tools or materials to subcontractors such as Brown and Guarino.  (Henry Dep. 78:23-80:7.)

There is evidence that engineers from Johnson Matthey would walk through the site and look for problems.  However, the walk-throughs do not establish actual oversight or control over safety standards at the site.  The PFI representative characterized these walk-throughs as such:  "As a client, he can walk the site, and if he sees any violation, he brings it to our attention that there is a violation.  If it's officially critical, then he can stop the operation."  (Henry Dep. 102:6-10.)  One of the Johnson Matthey engineers testified that walkthroughs were mostly about the operational function of the construction:  "We would look to make sure that we could reach things.  That valves were in the right position that we could turn them.  Operational kind of functions usually."  (Slivak Dep. 18:8-11.)  Safety items might be included on the list of problems the engineers would make after a walk-through; however, including an item on the list of problems was in the engineers' discretion, and they followed no general Johnson Matthey guidelines.  (Slivak Dep. 19:9-20-9.)  If the Johnson and Matthey engineers saw a safety problem, they would inform a PFI employee about it and not anyone at Johnson Matthey.  (Slivak Dep. 34:12-22; 46:12-47:12.)  The evidence shows that any oversight that Johnson Matthey provided was for quality control purposes to ensure that the facility met its specific requirements; safety oversight was merely an incidental possibility.

Johnson Matthey also had a document listing safety standards that it gave to contractors at its facilities.  (Slivak Dep. 38:11-14.)  A copy of this twelve-page handout was given to PFI in 2002.  (Id. at 39:23-24, 38:18-21.)  The parties incorporated into the contract the "Johnson

Matthey, Inc. Field Safety Manual titled 'Partners in Safety.'" This document, created by PFI, was apparently a hybrid manual combining both PFI and Johnson Matthey safety standards. (Slivak Dep. 40:6-25.) KLI argues the existence of this document is evidence that Johnson Matthey "maintained control of the jobsite and voluntarily created but failed to enforce its own safety protocol." (KLI Opp'n at 10.) However, the record shows that PFI was in fact responsible for enforcing safety standards at the job site. (Henry Dep. 81:16-82:5.)

In those situations where New Jersey courts have found that landowners exerted control over the work such that it was fair to impose a duty of care, the landowner was involved in the specifics of planning and implementing the work, Pfenninger, 770 A.2d at 1180-81, providing the materials or equipment to be used for the work, Sanna, 506 A.2d at 1162-63, or inspecting and monitoring the aspect of the work that ended up injuring the plaintiff, Carvalho v. Toll Bros. and Devs., 675 A.2d 209, 213-14 (N.J. 1996). None of these forms of control over the work are present here. While Johnson Matthey did provide some safety standards, those were incorporated by PFI into a joint safety manual to be enforced by PFI. (Henry Dep. 81:16-82:5.) Subcontractors checked in with PFI before starting work, not Johnson Matthey. (Id. at 38:19-39:13; 83:24-84:25.) Mullin brought his own equipment to the job site, and any additional materials needed would be provided by PFI, not Johnson Matthey. (Mullin Dep. Mar. 5, 2005 49:16-24; Mar. 20, 2007 105:20-106:24.) The Court finds that Johnson Matthey's conduct simply does not add up to control over the means or methods of the work subcontractors performed. See e.g., Dawson v. Bunker Hill Plaza Assoc., 673 A.2d 847, 852 (N.J. Super. Ct. App. Div. 1996) (finding no duty on part of landowner where landowner "did not provide any materials for the project that resulted in the hazardous condition, nor was the cause of the

collapse due to a preexisting condition on [landowner's] property").

The evidence before the Court, particularly the depositions of the representatives of PFI and Johnson Matthey, establishes that Johnson Matthey did not have a duty to oversee subcontractors and did not have a duty to ensure Plaintiff Mullin's compliance with safety standards.[6]  The Court will award summary judgment to Johnson Matthey.

## C.    INDEMNIFICATION AND DEFENSE COSTS

Plaintiff Mullin has no right of action against Brown and Guarino; as Plaintiff's employer Brown and Guarino is immune from suit by virtue of the exclusive remedies provided in the New Jersey Workers' Compensation Act.  Similarly, Brown and Guarino cannot be sued for contribution by other defendants/third-party plaintiffs.[7]  Ramos v. Browning Ferris Indus., 510 A.2d 1152, 1155 (N.J. 1986).  However, this does not mean that Brown and Guarino has no obligations to other parties in this case.

First, defendants PFI and KLI may place Brown and Guarino's conduct in issue at trial, though the jury may not find a percentage of negligence attributable to Brown and Guarino.  See Fabian v. Minster Mach. Co., 609 A.2d 487, 496 (N.J. Super. Ct. App. Div.), certif. denied, 130 N.J. 598, 617 A.2d 1220 (1992) (citing Brown v. U.S. Stove Co., 484 A.2d 1234 (1984) (attempt to shift causal blame to another who is not legally liable in suit is not improper).

Second, defendant PFI seeks indemnification from Brown and Guarino, as well as the

---

[6] The Court notes that Third Party Defendant PFI has not moved for summary judgment on this issue and so no conclusions regarding PFI's potential duty to Plaintiff Mullin are reached.

[7] Brown and Guarino appears to argue that Third Party Plaintiff KLI claims a right of contribution from Brown and Guarino.  To the extent that this is the case, Brown and Guarino's request for summary judgment on that count is granted.

costs of defending this suit.  Though the Workers' Compensation Act provides an exclusive

remedy and prevents tort actions, "[n]othing in the Act precludes an employer from assuming a

contractual duty to indemnify a third party through an express agreement." Ramos, 510 A.2d at

1159.  Brown and Guarino did just that in its contract with PFI and Johnson Matthey.

      The interpretation of contract language is a matter of law for the Court.  Driscoll Constr.

Co. v. N.J. Dep't of Transp., 853 A.2d 270, 276 (N.J.  Super. Ct. App. Div. 2004).  The Court

notes that the contract between PFI and Brown and Guarino includes a choice of law provision,

instructing that Massachusetts law should govern any contractual disputes.  (Donovan Cert., Ex.

H at 11.)  "It is well settled that the law of the state chosen by the parties will be honored so long

as that choice does not contravene a fundamental policy of New Jersey." Turner v. Aldens, Inc.,

433 A.2d 439, 441 (N.J. Super. Ct. App. Div. 1981).  The parties do not offer, and the Court does

not see, a reason not to apply this provision and consequently Massachusetts law will control.

One consequence of this choice of law determination is that Massachusetts law, unlike New

Jersey law, does not require the contract to be construed against the party seeking

indemnification.  In Massachusetts, "[i]ndemnifcation provisions are to be read without any bias

for the indemnitor or against the indemnitee." Herson v. New Boston Garden Corp.., 667 N.E.2d

907, 911 (1996).

      Article 6 of the contract speaks to liability and insurance, including indemnification.

Article 6.1 provides:

> Subcontractor shall indemnify and hold Contractor and Owner harmless from all
> claims, demands, suits, judgements, losses, expenses, actions and proceedings
> whatsoever which may be brought or result directly or indirectly on account of
> injuries or damages to persons or property, including employees of Contractor and
> Owner, incurred in the course of or as a result of the work covered by the

Subcontract whether during the performance of such work or thereafter, <u>whether or not resulting from the negligence of Contractor or Owner</u>. . . .  (Donovan Cert., Ex. H at 9-10 (emphasis added).)

Massachusetts law provides that "any provision for or in connection with a contract for construction. . . which requires a subcontractor to indemnify any party for injury to persons or damage to property <u>not caused by the subcontractor</u> or its employees, agents or subcontractors, shall be void."  Mass. Gen. Laws 149 § 29C (emphasis added).  The Massachusetts Appeals Court has interpreted this statute to mean that "a contractual obligation to indemnify is void whenever it provides for indemnification by a subcontractor regardless of the fault of the indemnitee, or its employees, agents or subcontractors, and this is so even if the indemnitee could prove at trial that the injured employee of the subcontractor was negligent."  <u>Harnois v. Quannapowitt Dev. Corp.</u>, 619 N.E. 2d 351, 352 (Mass. App. Ct. 1993), <u>rev. denied</u> 622 N.E. 2d 1364 (Mass. 1993). The focus of the inquiry is on the language of the indemnity agreement itself and not the facts of the alleged incident.  <u>Id.</u>

The Court concludes that Article 6.1 of the contract fails to limit indemnification claims to "those claims for which a causal connection is ultimately found between the act, omission or neglect of the subcontractor or its employees, agents or subcontractors, and the harm suffered by the claimant."  <u>Festa v. Peabody Construction Co.</u>, Civ. No. 93-4797 1994 WL 878823, * 2 (Mass. Super. Ct. Dec. 23, 1994) (construing language requiring indemnification "from all suits and claims against them, or any arising from ... any act or omission or neglect of the Subcontractor ... regardless of whether or not it is caused in part by a party indemnified hereunder" to require finding of causal connection between harm and negligence of indemnitor). While Massachusetts law does not prevent a subcontractor from agreeing to provide full

20

indemnification for the entirely of the loss where the subcontractor and the contractor both hold some responsibility, it does prevent indemnification based solely on the negligence of the contractor.  See Rush v. Norfold Electric Co., Inc., 874 N.E. 2d 447, 450 (Mass. App. Ct. 2007); Herson, 667 N.E.2d at 914-15.

The plain language of Article 6.1 contains no limitation on indemnification and would permit a situation whereby indemnification would be required for harm caused entirely by the sole negligence of the indemnitee.  The language cannot be read in a way to save the provision by requiring any causal connection between actions by the subcontractor and the resulting loss.  Cf. Festa, 1994 WL 878823 * 2.  This is exactly the situation the Massachusetts law prohibits, and the contract language is almost identical to provisions Massachusetts courts have found void. See Harnois, 619 N.E.2d at 287-89 (voiding contract language providing for indemnification from subcontractor to contractor and owner for liability "whether such liability be the result of the alleged active or passive negligence of the Owner or Contractor, their agents, servants, or employees").  Article 6.1 is void under Massachusetts law.

PFI attempts to rely on Article 6.3, which does not contain this problematic language and does not require the subcontractor to provide indemnification for harms it had no part in causing. Article 6.3 provides:

> Contractor and Owner shall not be responsible or be held liable for any damage to person or property consequent upon the use, misuse, or failure of any items such as hoists, rigging, blocking, scaffolding o[r] other equipment used by Subcontractor...The acceptance and/or use of any items such as hoists, rigging, blocking, scaffolding or other equipment by Subcontractor or its Subcontractors shall be construed to mean the Subcontractor accepts all responsibility for any claims for damages whatsoever resulting from the use, misuse, or failure of said items. . . .(Donovan Cert., Ex. H at 11.)

However, Article 6.3 is not an indemnification provision.  It does not clearly establish a duty on the part of the subcontractor to assume responsibility for claims brought against the contractor or owner.  The Court is required to "interpret the contract as a whole, in a reasonable and practical way," and the plain language of the contract clearly indicates that the now-void Article 6.1 was intended to establish express indemnification obligations.  USM Corp. v. Arthur D. Little Systems, Inc., 546 N.E. 2d 888, 893 (Mass. App. Ct. 1989).  The Court declines to import indemnification language into Article 6.3.  See also Fall River Housing Auth. v. H.V. Collins Co., 604 N.E. 2d 1310, 1312-13 (Mass. 1992) (discussing requirement that indemnity provisions be construed based on the intentions of the parties and declining to find an implied indemnity agreement where an express indemnity clause already governed parts of their relationship).

Brown and Guarino's contractual duties were not limited to indemnification, however. Article 6.2 of the contract obligates Brown and Guarino to defend PFI and Johnson Matthey.

> Subcontractor shall assume on behalf of Contractor and Owner and conduct with due diligence and in good faith, and at Subcontractor's own expense, the defense of any suit against Contractor or Owner whether or not Subcontractor be joined therein, seeking recovery for any loss, damages, injury, sickness, disease or death within the import of this indemnity clause, even if such suit be groundless, false, or fraudulent; provided however, that without relieving Subcontractor or its obligation hereunder, Contractor or Owner may elect to defend or participate in the defense of any such suit.  (Donovan Cert., Ex. H at 11.)

The contract establishes separate duties to defend and to indemnify.  These contractual duties stand (or fall) independently of each other.  See N. Am. Site Devs., 827 N.E. 2d at 253 n.4. Contractual obligations requiring subcontractors to defend contractors or owners against suits are not covered by the requirements of Mass. Gen. Laws 149 § 29C.  See Herson, 667 N.E.2d at 914

22

("Had the Legislature wished to encompass the often utilized 'duty to defend' provisions within the protective ambit of § 29C, it presumably would have said so expressly.").  Article 6.2 is valid, and Brown and Guarino will be required to assume the defense of PFI and Johnson Matthey in this suit.

## IV.     CONCLUSION

As detailed above, KLI's motion for summary judgment on Mullin's claims for failure to comply with the statute of limitations is denied.  Third-party defendant Johnson Matthey's motion for summary judgment on third-party plaintiff KLI's claim for contribution is granted. Fourth-party plaintiff PFI's motion for summary judgment and a declaration regarding indemnification is granted in part and denied in part; PFI's motion for a declaration that Brown and Guarino is obligated to defend it in this case is granted.  Johnson Matthey's motion for a declaration regarding Brown and Guarino's duty to defend obligations is similarly granted. Because the Court concludes that the indemnification provision at issue is void, PFI's motion for a declaration that Brown and Guarino is obligated to indemnify it is denied, and Brown and Guarino's cross motion seeking a declaration that it is not required to indemnify PFI is granted. Johnson Matthey has been granted summary judgment on all claims against it and so Johnson Matthey's motion for a declaration regarding indemnification is denied as moot.  An accompanying order will issue today.

Date:   3/19/2008                                      /s/ Robert B. Kugler
                                                       Robert B. Kugler
                                                       United States District Judge